**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MIKE SERRANO, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | **DEMAND FOR JURY TRIAL** |
| DIRECT DIGITAL HOLDINGS, INC., MARK WALKER, DIANA DIAZ, and SUSAN ECHARD, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**
**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Plaintiff Mike Serrano ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Direct Digital Holdings, Inc. ("Direct Digital" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Direct Digital common stock during the period from April 17, 2023 through

March 25, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class").  This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2.     Direct Digital is an end-to-end, full-service programmatic advertising platform that provides advertising technology, data-driven campaign optimization, and other solutions to markets on both the buy- and sell-side of the digital advertising ecosystem.

3.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material facts, including that: (i) the Company's transition towards a "cookie-less" advertising environment was accelerated and would impact revenue in 2024; (ii) the Company's alternatives to third-party cookies, including planned investments in artificial intelligence ("AI") and machine learning to build on first-party data sources, would not be viable alternatives to third-party cookies and similar tracking technologies; (iii) the Company did not have adequate solutions to address the impending phase out of third-party cookies by Google; and (iv) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the effectiveness of Direct Digital's platform and related financial results, growth, and prospects.

4.     On December 11, 2023, White Diamond Research published a report (the "White Diamond Report") addressing Direct Digital.  The White Diamond Report noted, *inter alia*, that Direct Digital "doesn't mention any patents and reports zero R&D expense for its technology", which "suggests that its tech isn't proprietary and isn't improving to keep up with the strong competition in the space"; as well as asserted, *inter alia*, that the Company "is practically broke,

with a reported $5.5M in cash, accounts payable that almost doubled quarter over quarter to $45M, and a sizeable debt of $24M with a 15% interest rate."

5.      On this news, the price of Direct Digital common stock declined by $1.39 per share, or 11.31%, from $12.29 per share on December 8, 2023 to close at $10.90 per share on December 11, 2023.

6.      On March 26, 2024, Direct Digital announced that it missed revenue estimates for the fourth quarter of 2023, citing lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing, and proactive efforts by Direct Digital to accelerate its transition towards a "cookie-less" advertising platform.  Defendant Mark Walker ("Walker"), Direct Digital's Chief Executive Officer ("CEO"), Co-Founder, and Chairman, also revealed that in the fourth quarter of 2023, it "became clearer" that cookie depreciation would begin in the first quarter of 2024 and that, "[a]s such, our team proactively began our transition off of cookies for media transactions."

7.      On this news, the price of Direct Digital common stock declined by $10.47 per share, or approximately 39%, from $26.51 per share on March 26, 2024 to close at $16.04 per share on March 27, 2024.

8.      Then, on April 2, 2024, Direct Digital disclosed that a material weakness had been "identified in [its] review of internal control over financial reporting as of December 31, 2023."

9.      On this news, Direct Digital's stock price fell $1.49 per share, or 10.4%, from $14.31 per share on April 1, 2024 to close at $12.82 per share on April 2, 2024, further injuring investors.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367, and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with the Houston Division of the Southern District of Texas so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in the Houston Division of the Southern District of Texas and conducts substantial business here.

14.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Direct Digital common stock during the Class Period and has been damaged thereby.

16.     Defendant Direct Digital operates as an end-to-end full-service programmatic advertising platform and is headquartered in Houston, Texas.  The Company's stock trades on the Nasdaq under the ticker symbol "DRCT."

17.     Defendant Walker has served as the CEO, Co-Founder, and Chairman of Direct Digital at all relevant times.

18.     Defendant Diana Diaz ("Diaz") has served as Chief Financial Officer ("CFO") of Direct Digital from October 2023 to the present.  She also served as Interim CFO beginning in June 2023.

19.     Defendant Susan Echard ("Echard") served as CFO of Direct Digital from June 2021 to June 2023.

20.     Collectively, Defendants Walker, Diaz, and Echard are referred to throughout this complaint as the "Individual Defendants."

21.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market.  The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

22.     Direct Digital and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Direct Digital is an end-to-end, full-service programmatic advertising platform.  It operates through its portfolio of companies, including Huddled Masses, LLC, Colossus Media, LLC, and Orange 142, LLC.

24.     The term programmatic advertising refers to the process of how ads are bought and sold in the advertising space.  It differs from more traditional media buying methods due to its use of automated technology and algorithmic tools.  Essentially, it automates the decision-making process of ad placement – without having to manually negotiate prices or placements like other platforms.

25.     Across the programmatic advertising industry, third-party cookies have played a pivotal role.  By leveraging cookies, which are small files that websites send to users' browsers, advertisers can send tailored ads to users who are most likely to interact with them based on factors such as their browsing history and interests.  In 2023, approximately 51% of programmatic advertisers relied on third-party cookies.  First-party cookies differ in that they only work on a single domain, and thus do not track users' activity across multiple websites.

26.     To make its programmatic advertising platform more effective, Direct Digital relies heavily on the use of third-party cookies, mobile device identifiers, and other tracking technologies.  The Company states that its third-party cookies and mobile device identifiers "record information such as when a consumer views or clicks on an advertisement, when a consumer uses a mobile app, the consumer's location, consumer demographic, psychographic

interest and browser or other device information."  Direct Digital uses this data to help advertisers decide whether to bid on, and how to price, an ad impression in a certain location, at a given time or for a particular consumer.

27.     While Direct Digital has continued to rely on third-party cookies both during and leading up to the Class Period, the programmatic advertising industry has been preparing for the forthcoming decline of third-party cookie usage.  In January 2020, Google announced the Privacy Sandbox initiative to facilitate online advertising without the use of third-party cookies and announced that it aimed to remove support for third-party cookies in the Google Chrome web browser by 2023.  Other popular web browsers, including Safari and Firefox, have already eliminated third-party cookies.

28.     In response to the Privacy Sandbox initiative, the United Kingdom's Competition and Markets Authority ("CMA") opened an investigation in January 2021, highlighting concerns that Google's proposals could undermine publishers' abilities to generate revenue and competition in digital advertising, entrenching Google's own market power.  Soon after, in March 2021, Google announced that it would not build alternate identifiers to track individuals as they browse across the web, nor would Google use them in its products.

29.     The CMA investigation closed in February 2022, and Google implemented agreed-upon commitments for its depreciation of third-party cookies in Chrome.  In July 2022, Google announced that it would delay its timeline for cookie depreciation in Chrome to 2024.  More recently, in April 2024, Google announced that it would not complete the depreciation in 2024 and planned to begin the phase-out in the first quarter of 2025.

30.     The cookie depreciation decision from Google Chrome, like in Safari and Firefox, is in line with a growing shift in public attitudes towards online tracking, including concerns over

privacy and data protection.  Third-party cookies are capable of collecting a significant amount of personal information about a user, which can be used to create detailed profiles, often without users' consent or knowledge, and sometimes for malicious purposes such as stealing personal information or delivering malware.  In response, certain regulations have evolved to address these concerns, with the General Data Protection Regulation requiring users' consent to store third-party cookies and the California Privacy Rights Act requiring that websites offer an opt-out option for users.

31.     As a result of the overall decline of third-party cookies, the programmatic advertising industry has acknowledged the need to adapt.  In April 2023, Direct Digital specified that, "[a]s the advertising industry faces the eventual phasing out of third-party cookies, namely by Google, by 2024, small-to-mid-sized business will face potentially greater challenges in the adoption and transition to digital."

32.     Yet throughout the Class Period, Defendants touted the Company's reach in the advertising and brand marketplace through numerous initiatives, but downplayed Direct Digital's reliance on third-party cookies and other tracking mechanisms, which were subject to the negative public attention regarding data privacy concerns and imminently threatened by Google's Privacy Sandbox initiative.  For example, Defendant Walker represented to investors that Direct Digital was experiencing "substantial growth" in "both our buy-side and sell-side advertising segments" and repeatedly made positive statements about favorable market dynamics, including "ramping up new partnerships on the DSP side as well as the publisher side in order to maintain the current momentum that we actually have in the marketplace."

33.     Despite the serious threat posed by cookie depreciation, Defendants continued to represent that Direct Digital's advertising segments were growing rapidly, with Defendant Walker

stating in August 2023 that "we have been making investments in our infrastructure and services, which we are starting to see ***the benefits of which will carry us through the remainder of the year and through 2024***."  He further stated that in the second quarter of 2023, "we continued to make ***considerable progress with our server transitions as well as our overall replatforming strategy, all the while maintaining business growth and capturing incremental market share***."

34.    Moreover, Defendants Direct Digital, Walker, and Echard suggested that "the impending phase out of cookies" would not be a concern, stating that the Company has "begun integrating identity resolution solutions in order ***to provide our clients with accurate, targeted advertising without cookies***" and that these solutions were likely to "***provide higher CPM (cost per thousand impressions) advertising, thus resulting in higher revenues.***"

35.    Despite these representations to investors that Direct Digital's advertising segments were growing rapidly and were poised to continue raising revenues without the use of third-party cookies, Direct Digital did not actually have viable alternatives in place to combat cookie depreciation and investors were not warned that the process would be accelerated.  As a result of Defendants' misleading statements and omissions, investors were unaware of the true impacts of the decline of third-party cookie usage on Direct Digital's advertising business.

**Materially False and Misleading Statements and Omissions Issued During the Class Period**

36.    The Class Period starts on April 17, 2023, when Direct Digital filed its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K").  In the 2022 10-K, Defendants Direct Digital, Walker, and Echard stated:

> As a result of the impending phase out of third-party cookies by 2024 by Google, we have begun integrating identity resolution solutions in order to provide our clients with accurate, targeted advertising without cookies. ***We believe these solutions provide higher CPM (cost per thousand impressions) advertising, thus resulting in higher revenues.*** Leveraging our third-party technology providers, our technology has a potential reach of over 250 million matched people online and is

powered by over 600 million unique online authentication events per month. To cater to the need for precision and scale, we will be investing in artificial intelligence and machine learning technology to build out our own collection of identities, often referred to as an "ID Lake," from first-party and third-party data sources, that will facilitate matches and relations between the disparate sets of data.

37.     On May 11, 2023, Direct Digital held an earnings call about its reported financial

results for its fiscal 2023 first quarter.  On the call, Defendant Walker stated:

> ***We believe the current market dynamics are favorable for Direct Digital Holdings as we see an increase in media spend being targeted to reach growth in multicultural audiences, while simultaneously middle market companies are moving dollars away from traditional media spend to digital.*** As a company, ***our primary focus for the year is to continue our strong growth trajectory***, and we are reaffirming our estimate as disclosed in our year-end 2022 update of $118 million to $122 million in top line revenue.

38.     In response to an analyst's question about stabilization in the advertising market,

Defendant Walker stated:

> So our goal is to continue to expand our growth, not just on the sell side business, which I think you know ***our strategy is currently with our pipeline and continuing to add more publishers***. In addition to that, one of the other things that we've been working on diligently as part of this transition is the actual optimization of our overall performance between our hardware and our software. So some of the investments that you're seeing is also to optimize so that we can get better performance so that we can continue to grow our business. We're anticipating, as we've said before, Q1 is usually our slowest quarter.
>
> As of right now, that's exactly what we're anticipating for our go forward. ***And so we really are looking at ramping up new partnerships on the DSP side as well as on the publisher side in order to maintain the current momentum that we actually have in the marketplace. In addition to that, what I would also say, we have put in a significant amount of effort into reaching the advertising marketplace and the brand marketplace with our marketing initiatives and also with the addition of our Chief Growth Officer. And we're starting to see some fruits from those actions as well. That is benefiting us in the long run.***

39.     On the same call, Defendant Echard also represented:

> The sell side advertising segment gross margins were 14% for the first quarter of '23 compared to 18% in the first quarter of '22. ***As this business segment continues to grow, the slight reduction in the margins are due to continued investment in our technology and our overall mix of publishers.*** With respect to the operating

leverage of the SSP programmatic business, this higher revenue results in higher dollar EBITDA contribution by the sell side segment.

40.     During the August 10, 2023 earnings call, Defendant Walker stated:

This quarter, we saw strong top line growth across both our sell-side and buy-side businesses. ***As well as considerable increases in market share. Our open marketplace CPM platform continues to benefit as middle market businesses look for less expensive, less restrictive, more accessible and more representative advertising solutions.***

* * *

***Our revenue this quarter was driven by strong performance by both our buy-side and sell-side advertising segments, which saw substantial growth.*** We are pleased to report increases in revenue growth by segment of 27% and 98%, respectively, over the same period of 2022. In the second quarter, our sell-side advertising segment processed approximately $300 billion monthly impressions, an increase of 205% over the same period of 2022.

In addition, this quarter, the company's sell-side advertising platform received over 11.2 billion monthly bid responses, an increase of 70% over the same period in 2022, through 119,000 advertisers for the quarter, which is a 34% increase over the same period last year. On the buy side, our businesses saw growth of approximately 227 customers, a slight decrease year-over-year. However, revenue per customer increased 36% compared to the same period last year.

41.     Defendant Walker further stated:

Turning to the remainder of 2023. ***We believe the current market dynamics are favorable for Direct Digital holdings as we see an increase in media spend being targeted to reach growth and multicultural audiences while simultaneously middle market companies are moving dollars away from traditional media spend to digital.***

In addition, with our portfolio of customers, we're seeing deepened investments in digital marketing. As we have mentioned in previous quarters, ***we have been making investments in our infrastructure and services, which we are starting to see the benefits of which will carry us through the remainder of the year and through 2024. This quarter, we continued to make considerable progress with our server transitions as well as our overall replatforming strategy, all the while maintaining business growth and capturing incremental market share.***

***As our company reaches a certain size and scope, we're able to pull certain levers, realizing efficiencies across many aspects of our platform***. In combination, we also believe that the U.S. economy will continue to move forward, and our market segment will continue to outperform in the second half of the year.

42.     During the November 10, 2023 earnings call, Defendant Walker again commented

on Direct Digital's significant growth and increased capabilities in its platform:

> However, we're pleased to report these benefits and associated growth are coming
> to fruition within 2023. ***Our technology partnerships and our overarching
> business strategy have enabled us to meet a growing number of customers'
> demand and further the capabilities of our technology platforms.***
>
> As a result, ***our open marketplace CPM platform continues to benefit as middle
> market businesses seek our differentiating thoughtful approach to our advertiser
> technology and our tech-enabled solutions. Furthermore, our recently
> announced strategic partnerships have also helped drive our business to new
> highs.*** Our new collaboration between Amazon Publisher Services and our
> Colossus SSP division, integrates Amazon's transparent ad marketplace. This
> integration has allowed Colossus SSP's roster of publishers, which include both
> minority-owned and multicultural outlets and general market properties to tap into
> the benefits of Amazon server-side header bidding solutions that offer a direct
> auction approach.
>
> Most recently, we announced the selection of HPE GreenLake Edge-to-Cloud
> platform to build a highly reliable, scalable and secure production environment.
> Our Colossus SSP division will now incorporate the HPE GreenLake platform with
> its on-premise infrastructure and cloud services across its entire marketplace to
> support Direct Digital Holding sell-side platform.
>
> Our partnership with Beeswax, a FreeWheel-owned programmatic buying
> platform, has expanded our access to as well as simplify the path for buying
> multicultural alongside general market connected TV ad inventory, helping drive
> growth within Colossus SSP, Huddled Masses and Orange142.
>
> ***We will continue to explore opportunities with our strategic partnerships as we
> continue to execute on our growth strategy. As a result of all these initiatives,
> DRCT saw significant growth across both the sell and buy side.***

43.     Defendant Walker further represented that, "***for the remainder of 2023, we believe

our technology strategy, infrastructure and operational investments will continue to bear fruit

as we make considerable progress with our server transitions as well as our overall

replatforming***."

44.     The statements referenced above in ¶¶ 36-43 were materially false and/or

misleading when made because they failed to disclose the following adverse facts pertaining to

Direct Digital's programmatic advertising platform, which were known to Defendants or recklessly disregarded by them as follows: (i) the impact of the Company's decision to accelerate its transition towards a "cookie-less" advertising environment; (ii) the Company's alternatives to third-party cookies, including planned investments in AI and machine learning to build on first-party data sources, would not be viable alternatives to third-party cookies and similar tracking technologies; (iii) the Company did not have adequate solutions to address the impending phase out of third-party cookies by Google; and (iv) that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the effectiveness of Direct Digital's programmatic advertising platform and related financial results, growth, and prospects.

### The Truth Emerges

45.     On December 11, 2023, White Diamond Research published a report addressing Direct Digital.  The White Diamond Report noted, *inter alia*, that Direct Digital "doesn't mention any patents and reports zero R&D expense for its technology", which "suggests that its tech isn't proprietary and isn't improving to keep up with the strong competition in the space"; as well as asserted, *inter alia*, that the Company "is practically broke, with a reported $5.5M in cash, accounts payable that almost doubled quarter over quarter to $45M, and a sizeable debt of $24M with a 15% interest rate."

46.     On this news, the price of Direct Digital common stock declined by $1.39 per share, or 11.31%, from $12.29 per share on December 8, 2023 to close at $10.90 per share on December 11, 2023.

47.     On March 26, 2024, Direct Digital announced that it missed revenue estimates for the fourth quarter of 2023, citing lower-than-anticipated demand, a delay in the release of Tier 1

publishers from beta testing, and proactive efforts by Direct Digital to accelerate the transition towards a "cookie-less" advertising platform.

48.    On this news, the price of Direct Digital common stock declined by $10.47 per share, or approximately 39%, from $26.51 per share on March 26, 2024 to close at $16.04 per share on March 27, 2024.

49.    Then, on April 2, 2024, Direct Digital disclosed that a material weakness had been "identified in [its] review of internal control over financial reporting as of December 31, 2023."

50.    On this news, Direct Digital's stock price fell $1.49 per share, or 10.4%, from $14.31 per share on April 1, 2024 to close at $12.82 per share on April 2, 2024, further injuring investors.

## ADDITIONAL SCIENTER ALLEGATIONS

51.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Direct Digital's common stock as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Direct Digital, their control over, and/or receipt or modification of, Direct Digital's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Direct Digital, participated in the fraudulent scheme alleged herein.  The adverse events at issue also involved the centerpiece of Direct Digital's business, its programmatic advertising platform.

52.     As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

53.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

54.     On December 11, 2023, White Diamond Research published a report addressing Direct Digital.  The White Diamond Report noted, *inter alia*, that Direct Digital "doesn't mention any patents and reports zero R&D expense for its technology", which "suggests that its tech isn't proprietary and isn't improving to keep up with the strong competition in the space"; as well as asserted, *inter alia*, that the Company "is practically broke, with a reported $5.5M in cash, accounts payable that almost doubled quarter over quarter to $45M, and a sizeable debt of $24M with a 15% interest rate."  On this news, the price of Direct Digital common stock declined by $1.39 per share, or 11.31%, from $12.29 per share on December 8, 2023 to close at $10.90 per share on December 11, 2023.

55.     On March 26, 2024, Direct Digital announced that it missed revenue estimates for the fourth quarter of 2023, citing lower-than-anticipated demand, a delay in the release of Tier 1 publishers from beta testing, and proactive efforts by Direct Digital to accelerate the transition towards a "cookie-less" advertising platform. On this news, the price of Direct Digital common stock declined by $10.47 per share, or approximately 39%, from $26.51 per share on March 26, 2024 to close at $16.04 per share on March 27, 2024.

56.     Then, on April 2, 2024, Direct Digital disclosed that a material weakness had been "identified in [its] review of internal control over financial reporting as of December 31, 2023."

On this news, Direct Digital's stock price fell $1.49 per share, or 10.4%, from $14.31 per share on April 1, 2024 to close at $12.82 per share on April 2, 2024, further injuring investors.

57.     The decline in Direct Digital's stock price is directly attributable to the announcements of missed revenue estimates due in large part to its accelerated transition to a "cookie-less" advertising platform and material weaknesses in its internal controls.

## NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

59.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class of all persons and entities who purchased or otherwise acquired Direct Digital common stock during the Class Period.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

61.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

62.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

- Whether Defendants violated the Exchange Act;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

- Whether the price of the Company's stock was artificially inflated; and

- The extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

66.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against

Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

67.     In the alternative, Plaintiff is entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- The Company's common stock traded in efficient markets;

- The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and other members of the Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

68.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

69.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein.  The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.     Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D.      Awarding Plaintiff and the other Class members such other relief as this Court may

deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 9, 2024                          Respectfully submitted,

                                             POMERANTZ LLP

                                             */s/ J. Alexander Hood II*
                                             J. Alexander Hood II
                                             (S.D. Tex. Federal Bar Number 3086579)
                                             Jeremy A. Lieberman
                                             (S.D. Tex. Federal Bar Number 1466757)
                                             600 Third Avenue, 20th Floor
                                             New York, NY 10016
                                             Telephone: (212) 661-1100
                                             Facsimile: (917) 463-1044
                                             ahood@pomlaw.com
                                             jalieberman@pomlaw.com

                                             BRONSTEIN, GEWIRTZ &
                                             GROSSMAN, LLC
                                             Peretz Bronstein
                                             (*pro hac vice* application forthcoming)
                                             60 East 42nd Street, Suite 4600
                                             New York, New York 10165
                                             Telephone: (212) 697-6484
                                             Facsimile: (212) 697-7296
                                             peretz@bgandg.com

                                             *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Mike Serrano, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Direct Digital Holdings Inc. ("Direct Digital") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Direct Digital securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Direct Digital securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Direct Digital securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed**  July 1, 2024
                    **(Date)**

                                        (Signature)

                              Mike Serrano
                                 **(Type or Print Name)**

**Direct Digital Holdings, Inc. (DRCT)**                                                    **Mike Serrano**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 3/15/2024 | 12 | $34.4500 |
| Purchase/Acquisition | 3/15/2024 | 8 | $34.4500 |
| Purchase/Acquisition | 3/15/2024 | 45 | $34.2400 |